**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------×
TIFFANY CATALINI,

        *Plaintiff,*　　　　　　　　　　　　　　**20 CV 6306**

  *v.*

JONES LANG LASALLE AMERICAS, INC.,　　　**COMPLAINT**

        *Defendant.*
------------------------------------------------------------------------×

      Plaintiff Tiffany Catalini, by her counsel, the Law Offices of Veronica S. Jung PLLC, alleges for her Complaint against Jones Lang LaSalle Americas, Inc., as follows:

### PRELIMINARY STATEMENT

      1.      Tiffany Catalini, a licensed realtor with sixteen years experience in the real estate field, began working for Jones Lang LaSalle Americas, Inc. ("JLL"), a multi-billion-dollar real estate services company, in 2012.  At JLL, Ms. Catalini enjoyed years of professional growth, earning annual raises and bonuses, as well as a promotion to Production Associate.  However, Ms. Catalini's career began a rapid descent in 2017 when JLL hired and promoted Mo Beler.

      2.      Mr. Beler openly engaged in sexist, offensive behavior and turned the workplace, which was already largely male, into a boys club.  Mr. Beler eventually came to manage Ms. Catalini's working group, at which point he began forcing Ms. Catalini – the only woman in the group and the only woman out of over fifteen Production Associates – to perform menial and degrading tasks such as fetching him lunch and bringing him clean clothes.

      3.      Mr. Beler openly complained that Ms. Catalini earned too much money, even though she earned no more than her similarly situated peers.  Mr. Beler then gave Ms. Catalini the lowest annual bonus she had ever received during her career at JLL and denied her an annual salary increase, while giving raises and larger bonuses to Ms. Catalini's male colleagues.

1

4. Even though Mr. Beler left the company in late 2019, he had doomed Ms. Catalini's career with JLL. Management at JLL viewed Ms. Catalini as suitable only for lower level positions typically filled by women and tried to convert her into an Administrative Assistant, a significant demotion. Shortly after Ms. Catalini refused, JLL terminated her, even though she had open offers to join other teams at the Company.

5. JLL violated federal, state, and city law by discriminating against Plaintiff Catalini on the basis of her gender, and its actions caused her significant harm. Plaintiff Catalini seeks damages and costs against Defendant JLL for discriminating against her on the basis of her gender in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq* ("NYCHRL") by creating a hostile work environment based on gender and ultimately terminating her because of her gender.

6. JLL also retaliated against Plaintiff Catalini for complaining about illegal gender discrimination, in violation of the NYCHRL.

7. Plaintiff Catalini also seeks damages and costs against Defendant for failing to pay her a guaranteed retention bonus, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York State Labor Law ("NYLL"), N.Y. Lab. Law. § 1 *et seq*.

8. Plaintiff Catalini seeks further damages and costs against Defendant for retaliating against her for complaining about her unpaid bonus, in violation of FLSA § 215 *et seq.* and NYLL § 215 *et seq.*

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

9. Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction over Plaintiff's claims as Plaintiff is a citizen of the State of New York, Defendant is a corporation organized

under the laws of the State of Maryland with its headquarters located in the State of Illinois, and the amount in controversy is in excess of $75,000.

10. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## TRIAL BY JURY

11. Plaintiff respectfully requests a trial by jury

## PARTIES

12. Plaintiff Catalini, at all times relevant hereto, was and is a resident of New York County in the State of New York.

13. Upon information and belief, at all times relevant hereto, Defendant JLL was and is a corporation organized under the laws of the State of Maryland with its principal place of business located at 200 East Randolph Drive, Chicago, IL, 60601.

## STATEMENT OF FACTS

14. Plaintiff Catalini is a 46-year-old woman.

15. Plaintiff Catalini spent decades developing a career in the real estate business, working at multi-billion dollar real estate services companies such as Cushman & Wakefield and CBRE.

16. Plaintiff Catalini received her Real Estate License on or about March 25, 2014.

17. In and around 2012, Plaintiff Catalini began working for JLL as a Project Coordinator in JLL's Capital Market, New York Investment Sales group.

18. Plaintiff Catalini joined JLL as part of a team of approximately twenty-one other team members.

19. Capital Markets, which encompassed Plaintiff Catalini's Investment Sales Group as well as JLL's Debt team and several other small teams, was a male-dominated work environment.

20. Plaintiff Catalini was one of only two women working in the Institutional Group, and one of only a handful of women in Capital Markets.

21. The other woman working in the Investment Sales group, an analyst, left the company in 2017.

22. Both Plaintiff Catalini and her team excelled in their roles at JLL; as a result, other real estate companies began attempting to hire the team away from JLL.

23. In and around 2016, JLL offered Plaintiff Catalini and her team incentives to remain with the company, and Plaintiff Catalini, dedicated to her career with JLL, chose to accept JLL's offer and stay with the Company.

24. As part of JLL's offer, Plaintiff Catalini received a promotion to Production Associate and was promised a retention bonus of $100,000, payable in two installments of $50,000 over two years.

25. JLL made this offer to match an offer made by a competing firm to hire Ms. Catalini and others away. Several of Ms. Catalini's teammates chose to leave JLL to work for the competition.

26. At this point, Plaintiff Catalini looked forward to a long and fruitful career with JLL. Plaintiff Catalini enjoyed additional responsibilities as Production Associate, including responding to property inquiries; producing sales and lease comparables; targeting, researching and calling investors and building owners; preparing, presentations, executive summaries and offering memorandums; creating and managing property listings on internal and external

webpages; managing the contact and property deal tracking database; managing the closing documentation process; and partnering with the Finance team to document sales and ensure broker payment.

27. However, in and around September 2017 – not long after Plaintiff Catalini took the Production Associate position – JLL brought in Mo Beler as Managing Director in Capital Markets.

28. Prior to Mr. Beler's arrival at JLL, Plaintiff Catalini had been able to navigate JLL's male workforce; this immediately changed upon Mr. Beler's arrival.

29. Mr. Beler and the Debt group worked in the same vicinity as Plaintiff Catalini and her Investment Sales group in an open-plan space. As such, Plaintiff Catalini witnessed Mr. Beler's offensive, derogatory, and discriminatory behavior.

30. For example, Mr. Beler routinely engaged in sexist, "locker room" banter with his male colleagues, such as calling his coworkers – and ridiculing his clients as – "cocksuckers," shouting at his coworkers to "suck his dick," and making constant reference to "blow jobs" and masturbation.

31. Plaintiff Catalini did her best to avoid Mr. Beler and his outbursts, but he was almost impossible to ignore, given the layout of the office.

32. In and around March 2018, and despite his behavior, JLL promoted Mr. Beler to Vice Chairman.

33. As Vice Chairman, Mr. Beler directly managed Plaintiff Catalini's supervisors, Glenn Tolchin, Anthony Ledesma and Yoav Oelsner, and oversaw Plaintiff Catalini's entire group.

34. Upon becoming Plaintiff Catalini's manager, Mr. Beler's sexism transformed from an unpleasant distraction to a ceaseless barrage of sexism that directly impacted Plaintiff Catalini's ability to do her job.

35. Mr. Beler singled out Plaintiff Catalini, the one woman in the group, to do menial tasks for him such as fetching his lunch and getting clean clothes for him.

36. Mr. Beler's requests were well outside of Plaintiff Catalini's role and far beneath her paygrade, but Plaintiff Catalini had no choice but to acquiesce to Mr. Beler's demands.

37. Plaintiff Catalini had to drop her actual job responsibilities – marketing properties, engaging investors and managing the groups' deal tracking database – because of Mr. Beler's sexist demands. This put Plaintiff Catalini at a professional disadvantage and she needed to work harder than her male colleagues to make up for it.

38. Ms. Catalini complained to her direct supervisors, Mr. Tolchin, Mr. Ledesma and Mr. Oelsner several times that Mr. Beler's sexually inappropriate abuse impacted her ability to do her job.

39. Plaintiff Catalini told her supervisors that Mr. Beler was abusive and sexually inappropriate, and that his behavior made her extremely anxious and uncomfortable.

40. Plaintiff Catalini's supervisors, however, seemed powerless to stop Mr. Beler's abuse, as a boys-club atmosphere pervaded JLL's New York office.

41. While Mr. Beler was the most egregious offender, numerous other men from other teams on the floor felt free to tell sexually and racially offensive jokes, and generally treat the workplace like a locker room.

42. By engaging in such backward, sexist behavior, Mr. Beler, a senior manager, enabled others in the office to follow his lead and create an oppressive environment.

43. At the same time, the toxic atmosphere only worsened; one of the few African-American employees in Capital Markets quit because of an offensive, racist joke.

44. In and around September 2018, JLL added the Middle Markets team ("Middle Markets") into the larger Capital Markets Group.

45. Middle Markets operated in parallel to Plaintiff Catalini's Institutional Group, but the two groups shared space in the largely open-plan office.

46. Every single one of the roughly fifteen to twenty Production Associates who joined JLL as part of Middle Markets was male, making Plaintiff Catalini the only female Production Associate out of a much larger group.

47. Mr. Beler as co-head of both Investment Sales and Middle Markets, now had dozens of employees at his disposal, but continued to give Plaintiff Catalini, and only her, menial, degrading tasks.

48. Ms. Catalini, as a Production Associate, had job responsibilities well above the chores assigned her by Mr. Beler.

49. On top of this, Mr. Beler, regularly claimed that Plaintiff Catalini "made too much money," despite the fact that her salary was no more than her similarly situated colleagues.

50. Mr. Beler acted on his belief that Plaintiff Catalini was overpaid by cutting her bonuses.

51. First, in 2018, JLL failed to pay Plaintiff Catalini the $50,000 retention bonus to which she was contractually entitled, instead giving her a performance bonus of $25,000,

52. Upon information and belief, at least one of Plaintiff Catalini's male colleagues in the Institutional Group received *both* retention and performance bonuses in 2017 and 2018 while Plaintiff Catalini did not.

53. Plaintiff Catalini's 2019 bonus – reflecting performance in 2018, was only $10,000, significantly smaller than her male colleagues' bonuses.

54. Plaintiff Catalini's supervisors had recommended that Plaintiff Catalini receive a $25,000 bonus; Mr. Beler overruled them and allocated her a $10,000 bonus.

55. Plaintiff Catalini had received an annual bonus between $25,000 and $65,000 in her previous five years with the Company; Mr. Beler's decision to drastically cut her pay was obviously based on her gender, just like his decision to give her degrading tasks.

56. Similarly, Mr. Beler refused to give Plaintiff Catalini a merit increase in salary in 2019. Plaintiff Catalini received such increases in every year since she joined the company in 2012.

57. Plaintiff Catalini's male colleagues received salary increases in 2019.

58. Over the course of 2019, Plaintiff Catalini's three direct supervisors left JLL.

59. In and around August 2019, Mr. Beler left JLL.

60. While Mr. Beler's departure did alleviate the sexist atmosphere in the office, Ms. Catalini quickly discovered that Mr. Beler had done permanent damage to her career.

61. Even months after Mr. Beler's departure from the Company, Plaintiff Catalini continued to speak to the managers of other groups about the sexism that she faced under him, hoping to change the culture of the company and avoid experiencing such sexism again.

62. The atmosphere at JLL continued to be toxic even without Mr. Beler present.

63. After the departure of Mr. Beler and her supervisors, Plaintiff Catalini began receiving work from different groups. She did a significant amount of work for Middle Markets, as well as the Debt Team.

64. On October 1, 2019, Plaintiff Catalini received job offer from the head of the Debt Team to be an Administrative Assistant.

65. The Administrative Assistant position involved tasks such as managing calendars and compiling expense reports, tasks significantly below Plaintiff Catalini's job responsibilities.

66. The Administrative Assistant position was also a professional dead-end with no obvious avenues for advancement.

67. Additionally, Ms. Catalini knew that JLL frequently pigeonholed its few female employees into Administrative Assistant roles.

68. Accordingly, Plaintiff Catalini turned down the Debt Team's offer, telling them that she did not want to take a step backward and that she had received offers from Middle Markets to work with them.

69. In fact, Plaintiff Catalini had received offers to move to Middle Markets, as well as advice from Middle Markets managers on how to decline the Administrative Assistant position.

70. In mid-October, after Plaintiff Catalini rejected the Administrative Assistant offer, an Executive Assistant left the debt team and Plaintiff Catalini was asked to step in to work in a "transactional capacity" and train a temporary employee.

71. Before Plaintiff Catalini could accept a position with Middle Markets, she wanted to set up a performance evaluation for herself so that she could assess the direction of the Institutional Group.

72. Ms. Catalini received regular emails from JLL Human Resources with instructions and deadline reminders for self-evaluation/performance submissions, and she believed it was important to follow their directions.

73. Plaintiff Catalini submitted her self-review in and around the end of October, 2019, but for months could not get anyone from JLL to schedule a performance evaluation.

74. Plaintiff Catalini repeatedly approached increasingly senior levels of JLL management about a performance evaluation, about the fate of the Institutional Group, and about her unpaid retention bonus, yet received no answer to her questions.

75. In and around November 2019, Plaintiff Catalini had received an offer to work for the National Capforce Database team, though again did not intend to formally accept an offer until after a performance review.

76. In and around February 2020, Plaintiff Catalini was instructed to work with the (Shopping) Mall Sales team because their project coordinator had left JLL and received another offer from Middle Markets. Plaintiff Catalini began working with the Mall Sales Group, still waiting to formally accept any offer until after a performance review.

77. By this point, the situation at JLL was causing Plaintiff Catalini a significant amount of stress. She was being pulled in multiple directions by different departments, but was unable to get any clarity from the company about her role in Investment Sales.

78. On or about February 14, 2020, Plaintiff Catalini's male coworkers received their performance bonuses for calendar year. Plaintiff Catalini did not receive a bonus.

79. On or about March 2, 2020, Plaintiff Catalini discovered that her colleagues in the Institutional Groups received their bonus. She again emailed JLL management asking for a meeting to discuss her review, bonus, and merit compensation.

80. On March 6, 2020, JLL called Plaintiff Catalini into a meeting. She thought this would be her long-awaited performance review. Instead, JLL terminated her.

81. Plaintiff Catalini was shocked, not only by the decision to fire her, but by the fact that JLL would fire her when she had open offers from multiple Groups.

82. JLL's own personnel policies dictate that employees should be given opportunities to find other positions within the Company, and one of Plaintiff Catalini's male colleagues from the Institutional Group received approximately two months to find a new position with the Company.

83. Upon information and belief, no one else from Capital Markets was terminated at this time.

84. Plaintiff Catalini received no notice and no opportunity to shift positions within the Company.

85. Upon terminating Plaintiff Catalini, JLL offered her a severance package in exchange for, among other things, a waiver of claims against the Company.

86. When Plaintiff Catalini, in a subsequent phone call with JLL's Human Resources Department, objected to the package on the grounds that it did not include her unpaid retention bonus from 2018, JLL conceded that the bonus was owed to her and offered to increase the package by $25,000 to make Plaintiff Catalini "whole."

87. Thus, after years of Plaintiff Catalini's demands for her unpaid bonus, JLL admitted that it owed Plaintiff Catalini back wages, but made receipt of those wages contingent on her waiving claims against the company.

88. Plaintiff Catalini, the sole woman in her group, bore the sexist demands of Mr. Beler and withstood the hostile work environment he created.

89. Yet even after Mr. Beler's departure, JLL continued to discriminate against and retaliate against Plaintiff Catalini by seeking to move her into a lower-level "female" role,

refusing to engage her in a performance evaluation, continuing to deny her the bonus to which she was entitled, and ultimately terminating her for her complaints and for refusing to conform to the female stereotype.

90. Plaintiff Catalini has still not received the guaranteed retention bonus, nor the 2019 performance bonus that her teammates received in February 2020.

91. Plaintiff Catalini refused to sign away her rights and now brings this action against JLL.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Gender Discrimination in Violation of the NYCHRL

92. Plaintiff Catalini hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 92 with the same force as though separately alleged herein.

93. The NYCHRL prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of, *inter alia*, their race, gender, national origin, and disability.

94. JLL is an employer as contemplated by NYCHRL, and Plaintiff Catalini is an employee as contemplated by the NYCHRL.

95. JLL discriminated against Plaintiff Catalini on the basis of her gender, by taking adverse employment action against her, up to and including terminating his employment.

96. As such, JLL has violated the NYCHRL.

97. As a direct and proximate consequence of JLL's discrimination, Plaintiff Catalini has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

98. JLL's discriminatory treatment of Plaintiff Catalini was willful and/or in reckless disregard of Plaintiff Catalini's protected rights.  Accordingly, Plaintiff Catalini is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### Hostile Work Environment in Violation of the NYCHRL

99. Plaintiff Catalini hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 99 with the same force as though separately alleged herein.

100. The NYCHRL prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of, *inter alia*, their race, gender, national origin, and disability.

101. JLL is an employer as contemplated by NYCHRL, and Plaintiff Catalini is an employee as contemplated by the NYCHRL.

102. JLL discriminated against Plaintiff Catalini on the basis of her gender, by taking adverse employment action against her, up to and including terminating his employment.

103. As such, JLL violated the NYCHRL.

## THIRD CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL

104. Plaintiff Catalini hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 104 with the same force as though separately alleged herein.

105. The NYCHRL prohibits employers from retaliating against employees for complaining of discrimination.

106. Plaintiff Catalini repeatedly complained about offensive sexist statements and the derogatory way she was treated as a woman, both to her direct supervisors and other managerial-level employees at the Company.

107. Because of these complaints, JLL ended Plaintiff Catalini's career with the Company: as a result of speaking up about sexism in the Company she was denied a performance evaluation; offered a demotion to a lower-level, traditionally female role; and, when she refused to take it, terminated.

108. Accordingly, JLL violated the NYCHRL by retaliating against Plaintiff Catalini for her complaints of discrimination.

### FOURTH CAUSE OF ACTION
**Unpaid Wages in Violation of the NYLL**

109. Plaintiff Catalini hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 109 with the same force as though separately alleged herein.

110. At all times relevant to this action, Plaintiff was employed by Defendant within the meaning of the NYLL.

111. The NYLL mandates that employers pay their employees all earned wages.

112. In 2016, Defendant promised Plaintiff a retention bonus of $100,000, payable over two years on the condition that Plaintiff remained employed with the Company.

113. Defendant failed to pay Plaintiff the full retention bonus, even though she fulfilled its requirements and remained with the Company.

114. Defendant further failed to pay Plaintiff Catalini her calendar year 2019 bonus, despite paying one to each other member of her team.

115. Accordingly, Defendant violated the NYLL by failing to pay Plaintiff Catalini her earned wages.

116. Due to Defendant's NYLL violations, Plaintiff is entitled to recover from Defendant her unpaid wages, liquidated damages, and reasonable attorneys' fees, costs, and interest related to the action.

**SEVENTH CAUSE OF ACTION**
**Retaliation in Violation of the NYLL**

117. Plaintiff Catalini hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 117 with the same force as though separately alleged herein.

118. At all times relevant to this action, Plaintiff was employed by Defendant within the meaning of the NYLL.

119. The NYLL mandates that employers pay their employees all earned wages.

120. In 2016, Defendant promised Plaintiff a retention bonus of $100,000, payable over two years on the condition that Plaintiff remained employed with the Company.

121. Defendant failed to pay Plaintiff the full retention bonus, even though she fulfilled its requirements and remained with the Company.

122. Plaintiff continually reminded JLL of its obligation to pay her the unpaid bonus, including doing so only days before JLL terminated her.

123. Accordingly, Defendant violated the NYLL by retaliating against Plaintiff Catalini.

124. Due to Defendant's NYLL violations, Plaintiff is entitled to recover from Defendant her monetary damages, liquidated damages, and reasonable attorneys' fees, costs, and interest related to the action.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages to be determined at trial;

B. For the second cause of action, damages to be determined at trial;

C. For the third cause of action, damages to be determined at trial;

D. For the fourth cause of action, damages to be determined at trial;

E. For the fifth cause of action, damages to be determined at trial; and

F. For such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 11, 2020

            LAW OFFICES OF VERONICA S. JUNG, PLLC

            By: \_\_\_/s/ Veronica S. Jung\_\_\_
                VERONICA S. JUNG (VJ-6211)
                OWEN H. LAIRD (OL-6994)
                200 Park Avenue, Suite 1700
                New York, NY 10166
                Telephone: (212) 897-1981
                Facsimile: (212) 682-0278

            *Attorneys for Plaintiff*